UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ANTHONY PRENTICE,

        Petitioner,                      3:10-cv-00743-RCJ-VPC

vs.                                       **ORDER**

RENEE BAKER, *et al.*,

        Respondents.

Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Anthony Prentice, a Nevada prisoner. ECF No. 32.

I. BACKGROUND

This case arises from the brutal killing of Daniel Miller in his Las Vegas apartment in late August or early September of 2002. The Nevada Supreme Court recounted the facts and circumstances of the crime as follows:

> In September 2002, Officer John Campor of the Las Vegas Metropolitan Police Department (Las Vegas Metro) found Daniel Miller dead in his apartment while performing a welfare check at the request of Miller's sister. According to the Clark County Coroner's Office, Miller had been stabbed 128 times, suffered blunt force trauma to the head, and had a large swastika carved into his back. The Coroner's Office determined that Miller bled to death from his multiple stab wounds.
>
> While documenting the crime scene, investigators located a hammer on the bedroom floor of the apartment at the foot of the bed where Miller's body was

discovered. Investigators found items belonging to Anthony Prentice in the living room of the apartment including: a backpack, an appointment book, and scholarship application papers. Investigators also found fingerprints in the apartment matching those of both Prentice and James Harrison.

Prentice befriended Miller after his release from county jail, and began living with Miller about six months after they met.

Prentice, Harrison, and Ashley Ratelle each gave different accounts of the events occurring on the day of the murder.

Ashley Ratelle testified that on the day of the murder she overheard Prentice ask Harrison if Harrison would like to "kill Dan Miller." Ratelle testified that she overheard Harrison and Prentice discuss various methods of killing Miller, including a suggestion by Prentice that they hit the victim "over the head with the hammer [at] about the right temple and stab him [in the throat] and drag the knife." Prentice had a pocket knife, which he claimed he did not like carrying any longer, so he sold it to Harrison a couple of days prior to the murder. Several people testified as to the distinct appearance of this knife, and it is believed to be the murder weapon. Prentice also told officers that Harrison always carried a hammer in his backpack.

Ratelle testified the group loitered around the steps outside of Miller's apartment while Prentice entered and exited the apartment for approximately two to three hours to see if Miller was asleep. Prentice then came out and indicated that Miller was asleep, at which point Prentice handed over the knife and hammer to Harrison. Ratelle testified that Prentice then asked Harrison, "if he was ready to kill Dan." Ratelle testified that Prentice described the layout of the apartment to Harrison, and told Harrison that he needed to close his eyes for a few seconds when he first entered so that his eyes would adjust to the dark. Ratelle also testified that Prentice said, "[i]f there's any screaming, I'll go in and help you finish off Dan." Ratelle and Prentice walked around the apartment complex for about fifteen minutes to allow Harrison some time in the apartment with Miller. Prentice then re-entered the apartment in order to see if Harrison had killed Miller. Ratelle next saw Prentice running from the apartment repeatedly shouting to her, "Dan has [Harrison]." Ratelle testified that the two then ran in the direction of the University of Nevada Las Vegas, avoiding major streets because Prentice told her the cops would be looking for them.

Prentice's version of that night's events varied from Ratelle's. According to Prentice, Miller was openly homosexual, and Prentice had informed Miller that Harrison was bisexual. Prentice testified that the reason the three went to Miller's apartment that night was so Miller and Harrison could become more intimately acquainted. Prentice testified that after introducing Harrison and Miller, he left the apartment and went outside to meet Ratelle. Prentice testified that it was an unspoken rule between Miller and himself that when another man was over, Prentice was to wait outside for "like, twenty minutes to thirty minutes." At some point Prentice re-entered the apartment and heard noises emanating from the bedroom, which he interpreted as an argument. Prentice testified that he was disturbed by the noises coming from the bedroom and took off running from the apartment.

2

The State filed a motion to admit evidence of other bad acts, which included a third account of the events of that evening. According to the State, Harrison told detectives that he and Prentice walked to Miller's apartment to smoke a little marijuana. Miller came out of the bedroom complaining that the light and the noise awoke him. Prentice and Miller then got into an argument and a physical confrontation ensued. Harrison told detectives that Prentice then grabbed a knife and started stabbing Miller. Harrison entered the altercation by grabbing Miller and hitting him about the head and ribs. Harrison claims that during the altercation, Prentice accidentally sliced Harrison's arm.

The parties' stories reunite to indicate that after fleeing Miller's apartment, Prentice and Ratelle took off running eastbound toward the University of Nevada, Las Vegas. Prentice and Ratelle caught a bus to Henderson, where Prentice's friend, Diana Gumucio, resided. Once at Gumucio's residence, Ratelle dyed Prentice's hair black. While at Gumucio's, Ratelle heard Prentice ask another man if he could borrow a gun "[t]o go finish Dan off."

After several days, the Las Vegas Metro and Henderson Police apprehended Prentice in Henderson at Gumucio's apartment. The police asked if they could question Prentice, and he readily agreed to go to the station for questioning. Initially, Detective Long did not indicate to Prentice that they wanted to question him about the suspicious death of Miller. Detective Long testified that while in the car, it became apparent to Prentice that the police were homicide detectives at which point an unprovoked Prentice blurted out, "he was like my dad."

Upon arrival at the station, the officers indicated to Prentice they were investigating Miller's murder, and Prentice immediately stated, "I can tell you who did it. I'll tell you right now who killed him." Prentice told the officers that Harrison had killed Miller. When the station house interview concluded, Prentice accompanied Detective Long in his car on a search for Harrison. During this car ride, prior to learning any details of the murder from the police, Prentice told Detective Long, "if Dan Miller has a swastika carved in his forehead or in his back, then the National Socialist Regime (NSR) would be the ones responsible for this murder," indicating the NSR was setting Prentice up. Further investigation revealed Prentice was a member of the "Hammerskins," a skinhead organization; an ordained minister in the World Church of the Creator; [FN1. Subsequently renamed the Creativity Movement] and an initiator of an Aryan army in Las Vegas.

While in jail awaiting trial, Prentice wrote a letter to Harrison indicating that he had found a way for both men to beat the charges against them. Prentice testified he wrote to Harrison in order to get his trial severed from Harrison's trial. Prentice's prior motion for severance was denied, and he testified that he wanted Harrison to think they were still friends, so he could get close enough to attack him and the trials would have to be bifurcated. In May 2003, Prentice was involved in an altercation with a fellow inmate. Prentice beat the inmate about the head and body with his fists after the inmate indicated he did not approve of Prentice's racist ideologies. After this altercation, racist paraphernalia was found in Prentice's cell, and the State moved to introduce this paraphernalia. The court admitted the evidence despite defense counsel's objection.

3

ECF No. 38-3, p. 2-6.[1]

In April of 2004, Prentice was convicted, pursuant to jury verdicts, in Nevada's Eighth Judicial District Court of conspiracy to commit murder and first degree murder with use of a deadly weapon. On the latter charge he was sentenced to consecutive life sentences without the possibility of parole. In a decision rendered on June 15, 2005, the Nevada Supreme Court rejected Prentice's direct appeal.

On March 17, 2006, Prentice filed a state post-conviction petition. The state district court entered an order denying relief on March 10, 2008. On July 22, 2010, that denial was affirmed by the Nevada Supreme Court.

On November 29, 2010, this court received a *pro se* habeas petition from Prentice that initiated this action. The court appointed counsel for Prentice on June 14, 2011. The amended petition now before the court for decision was filed on July 23, 2013.

II.   STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[1] References to page numbers in the record are based on CM/ECF pagination.

4

1    A decision of a state court is "contrary to" clearly established federal law if the state court
2  arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the
3  state court decides a case differently than the Supreme Court has on a set of materially
4  indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable
5  application" occurs when "a state-court decision unreasonably applies the law of [the Supreme
6  Court] to the facts of a prisoner's case." *Id*. at 409.  "[A] federal habeas court may not "issue the
7  writ simply because that court concludes in its independent judgment that the relevant state-court
8  decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

9    The Supreme Court has explained that "[a] federal court's collateral review of a state-court
10 decision must be consistent with the respect due state courts in our federal system." *Miller–El v.*
11 *Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for
12 evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the
13 doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7
14 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination
15 that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'
16 on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)
17 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized
18 "that even a strong case for relief does not mean the state court's contrary conclusion was
19 unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v.*
20 *Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and
21 highly deferential standard for evaluating state-court rulings, which demands that state-court
22 decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

23    "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that
24 adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398.  In *Pinholster*, the Court
25 reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of
26

5

the state-court decision at the time it was made," and, therefore, the record under review must be "limited to the record in existence at that same time, i.e., the record before the state court." *Id*.

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable application of" limitations of 28 U.S.C. § 2254(d)(1). *Lockyer*, 538 U.S. at 71. In doing so, however, the Court did not preclude such an approach. "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.*

### III. ANALYSIS OF CLAIMS

Prentice's amended petition presents five separate clams premised on the legal theory that he was deprived of his constitutional right to effective assistance of counsel. Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984)). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief: deficient performance and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. A reviewing court "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting *Strickland*, 466 U.S. at 689).

With respect to the prejudice prong, the court must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors. *Strickland*, 466 U.S. at 696. Put another way, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Court in *Strickland* emphasized that the ultimate focus of an ineffective assistance of counsel inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* If the defendant makes an insufficient showing as to either one of the two *Strickland* components, the reviewing court need not address the other component. *Id*. at 697.

> . . . In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. . . .

*Id.*

In its decision adjudicating Prentice's post-conviction petition, the Nevada Supreme Court correctly identified *Strickland* as the clearly established federal law governing Prentice's ineffective assistance of counsel claims. ECF No. 38-5, p. 2. Thus, the question for his court is whether the Nevada Supreme Court's application of the *Strickland* standard was reasonable.

**Ground One**

In Ground One, Prentice claims that his counsel were ineffective by "failing to investigate the usability of the VCR tape of the apartment complex, instead of relying on the explanation by the police that the tape was unusable." ECF No. 32, p. 8. Prentice argues that counsel, by not reviewing the tape, failed in their duty to conduct a reasonable investigation as required by *Strickland*. He further claims that this court has prevented him from demonstrating prejudice by denying his motion for leave to conduct discovery.

The Nevada Supreme Court decided this claim in Prentice's post-conviction proceeding as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to investigate the veracity of a police claim that an apartment surveillance tape was not useable. Appellant fails to demonstrate his counsel's performance was deficient or that he was prejudiced. Appellant made only a bare and naked claim that the police's statement concerning the quality of the tape may not have been accurate. *Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984). Appellant fails to

7

> demonstrate a reasonable probability that the outcome of the proceedings would have been different had his counsel investigated the veracity of the police's claim. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

ECF No. 38-5, p. 3.

Prentice acknowledges that police officers testified at trial that the tape was unusable, but contends that their testimony is not to be believed because the same officers violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Be that it as may, he has not offered any facts that suggest the tape would provide exculpatory evidence. Accordingly, he has not established "good cause" for this court to order the production of the tape, assuming it is still available. *Cf. McDaniel v. United States Dist. Ct. ("Jones")*, 127 F.3d 886, 888 (9th Cir.1997) (upholding the lower court's discovery order where petitioner's claims "do not appear purely speculative or without any basis in the record).

Given the complete lack of proof that Prentice suffered any prejudice as a result of counsel's failure to review the VCR tape in question, the Nevada Supreme Court's decision to deny the claim is objectively reasonable and, therefore, entitled to deference under § 2254(d). Ground One is denied.

**Ground Two**

In Ground Two, Prentice claims that his counsel were ineffective by "failing to seek an expert witness to testify on the use of swastikas in racist groups." ECF No. 32, p. 10. At trial, the State presented testimony and made argument that the presence of a swastika carved in the victim's back inculpated Prentice because it was consistent with his admitted association with Nazi or Aryan groups. According to Prentice, an expert on white supremacists could have refuted such evidence and argument by testifying that neither the Hammerskins nor the Creativity Movement used the swastika as a symbol.

The Nevada Supreme Court decided this claim in Prentice's post-conviction proceeding as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to seek expert witnesses to testify on the use of swastikas in racist groups. Appellant fails to demonstrate that he was prejudiced. Appellant does not list any expert witnesses who could have testified about this issue and fails to demonstrate a reasonable probability of a different outcome had any further testimony in this area been presented. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

ECF No. 38-5, p. 5.

Even if Prentice is permitted to supplement the record herein, the material he has proffered (located at ECF No. 38-6 and 38-7) still fails to identify an expert willing to provide the testimony that he describes. The evidence presented at trial established that Prentice belonged to, or strongly identified with, white supremacist organizations (including some other than the Hammerskins and the Creativity Movement). In addition, Prentice admitted to the police that he had a swastika tattoo on his wrist that he had covered over. ECF no. 37, p. 27. Based on the record, the Nevada Supreme Court correctly concluded that Prentice did not suffer *Strickland*-type prejudice as a result of counsel's failure to retain an expert on the use of swastikas. Ground Two is denied.

**Ground Three**

In Ground Three, Prentice claims that his counsel were ineffective by "failing to seek to exclude any reference to his incarceration following his arrest for this crime." ECF No. 32, p. 13. As grounds for this claim, Prentice cites to three instances wherein the prosecutor, in questioning witnesses, mentions or refers to Prentice being in jail. Prentice argues that these references could be construed by the jury as evidnece of guilt.

The Nevada Supreme Court decided this claim in Prentice's post-conviction proceeding as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to seek to exclude any reference to his incarceration following his arrest for this crime. Given the strength of the evidence admitted at trial, appellant fails to demonstrate he was prejudiced by references to his incarceration. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

ECF No. 38-5, p. 3.

Here again, Prentice has not shown that the state court's rejection of his claim was an unreasonable application of the *Strickland* standard. Prentice approximates the prejudicial effect of the prosecutor's passing references to that of bringing him into the courtroom in shackles. Objectively speaking, however, a shackled defendant clearly would have greater impact on the jury, and Prentice cites no reported cases in which a court has granted relief based on a claim that counsel was ineffective in failing to object to shackling. Ground Three is denied.

**Ground Four**

In Ground Four, Prentice claims that his counsel were ineffective by "failing to suppress his statement to the police because he was not read the warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966)." ECF No. 32, p. 14-15. On the same day Miller was found dead in his apartment, detectives for the Las Vegas Metropolitan Police Department (LVMPD) located Prentice at an apartment in Henderson, Nevada, where his girlfriend was staying. Prentice was transported to the LVMPD's homicide offices where he agreed to a taped interview with Detective Long and Detective Ramos. Prentice was not provided with notice of his rights under *Miranda* prior to or during the interview.

At trial, Detective Long testified that Prentice voluntarily accompanied him to the homicide offices and readily agreed to provide information about the investigation. ECF No. 37, p. 13. He further testified that Prentice was placed in handcuffs while being transported, but only as a security measure, and that the handcuffs were removed upon arrival at the homicide office. *Id.*, p. 15-16. In addition, Long stated that, at the time of the interview, Prentice was not a suspect and was not in custody. *Id.*, p. 16-17.

The Nevada Supreme Court decided this claim in Prentice's post-conviction proceeding as follows:

> [A]ppellant argues that his trial counsel was ineffective for failing to suppress appellant's statements to the police because he was not read the warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant fails to demonstrate that his trial counsel's performance was deficient or that he was

10

1  prejudiced.  When appellant made the challenged statements, he was not considered a suspect and had agreed to help the police with the investigation.  In considering the circumstances in which appellant made the challenged statements, appellant fails to demonstrate he was undergoing a custodial interrogation and therefore, his statements were properly admitted at trial.  *Casteel v. State*, 122 Nev. 356, 362, 131 P.3d 1, 4 (2006); *Alward v. State*, 112 Nev. 141, 155, 912 P.2d 243, 252 (1996), overruled on other grounds by *Rosky v. State*, 121 Nev. 184, 111 P.3d 690 (2005).  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

ECF No. 38-5, p. 5-6.

*Miranda* warnings are required when a suspect is in custody and subjected to interrogation by the state.  *Miranda*, 384 U.S. at 444.  If a defendant has not been issued *Miranda* warnings and validly waived his rights, his statements made in the course of a custodial interrogation are inadmissible at trial.  *Id*. at 479.  To determine whether the defendant was in custody for the purposes of *Miranda*, "a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement' of the degree associated with formal arrest.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983).  The question is an objective one, which the Ninth Circuit Court of Appeals has characterized as whether a "reasonable innocent person in such circumstances" would conclude that he or she could refuse to answer officers' questions and leave. *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981).

In arguing that the Nevada Supreme Court's decision was an objectively unreasonable application of *Strickland*, Prentice contends that Detective Long's testimony at trial is contradicted by his arrest report, which indicates that Prentice had been arrested for a parole violation.  See arrest report, ECF No. 38-8, p. 1-6.  It appears as if the arrest report was part of the record provided to the Nevada Supreme Court prior to its decision (ECF No. 46-4. p. 53), but, in his arguments to that court, Prentice did not mention a probation violation arrest as grounds for triggering his *Miranda* rights (*id*. at 64-66).  Instead, he relied upon other factors: "the location of the interview (homicide office), the manner of transport (police car in handcuffs), and the fact that the [he] was never let out

of custody" after his first contact with the police. *Id*. Moreover, the only reference to the probation violation arrest in his brief to the Nevada Supreme Court was in his statement of facts wherein he noted that, *after the interrogation*, he was booked into jail for an alleged violation of probation. *Id*. at 53.

If the Nevada Supreme Court had denied Prentice's claim after finding that Prentice had been placed under arrest for a probation violation *prior* to police questioning (as Prentice now claims is the case), this court would be troubled by the state supreme court's decision. Under the circumstances, however, it was reasonable for the Nevada Supreme Court to not make such a finding. As noted, Prentice did not argue the point in his brief to the court. Moreover, Detective Long's sworn testimony at trial carries more evidentiary weight than a notation in his arrest report. And, as noted below, Prentice made comments during questioning that suggest that he had not been placed under arrest.

The question then is whether, based on the remaining circumstances, fairminded jurist could find that Prentice was not in custody. *Dyer v. Hornbeck*, 706 F.3d 1134, 1139 (9th Cir. 2013). In *Dyer*, the Ninth Circuit applied § 2254(d) to a decision by the California Court of Appeal that a defendant who had been detained in a locked squad car while detectives searched her home, then transported to a sheriff's office thirty minutes away for a four hour interview, was not in custody for *Miranda* purposes. *Id*. at 1136. The Ninth Circuit noted several factors supporting a finding that the interrogation was custodial ("its four-hour duration, the time of night at which it was conducted, the distance between the police station and Dyer's home, and the extent to which Dyer was confronted with evidence of her own guilt"), but nonetheless concluded that the state court decision was not objectively unreasonable. *Id*. at 1139.

In reaching this conclusion, the court relied on several cases, including *Oregon v. Mathiason*, 429 U.S. 492 (1977) and *Beheler*, in which the court held that the defendant was not in custody when he either voluntarily agreed to go to the police station, was expressly advised that he as not under

arrest, or both. *Id*. The court also considered other factors such as the "physical surroundings of the interrogation" and the "tone of the interrogation." *Id*. at 1140. With respect to the former, the court noted that interrogations are not necessarily custodial simply because they take place in a station house and that "circumstances may soften the police station's inherently intimidating atmosphere." *Id*. (citing *Beheler*, 463 U.S. at 1125). As for the tone of the interrogation, the court explained that an accusatory, coercive, or threatening tone weighs in favor of a finding of custody whereas an investigatory tone does not. *Id*. at 1140-41.

Here, Prentice was interviewed at the homicide office for approximately ninety minutes. ECF Nos. 38-9 and 38-10. He was not in handcuffs during the interview, and, beyond the fact that the interview took place in an interview room at a police station, there is no indication in the record to suggest that the physical surroundings were oppressive or intimidating. At the outset of the interview, Prentice seemed eager to volunteer information about the murder ("I'll tell you who did it right now."). ECF No. 38-9, p. 3. The first part of the interview was investigatory in tone, but later became more accusatory after Prentice contradicted himself several times and became excited and upset.

About half way through the interview, the following exchange took place:

Q: You're getting excited.

A: I'm getting frustrated because I know I'm going to jail. I know you guys are gonna handcuff me and take me to jail. Right? Am I right?

Q: That's a possibility. Right now I want to see if Evil exists. I want to know if Ashley exists. Right now I have a ___ with Evil and I have a name of Ashley. That's, that's your whole story.

A: Okay. Call - - -

Q: I mean we're gonna have a lot of physical evidence we're gonna have to go through.

A: Tonight? Before I can go anywhere?

Q: Or you're gonna help me find Evil and Ashley, right?

1  A: Okay. . . .

2  ECF No. 38-9, p. 44-45. That exchange was followed by this one a few minutes later:

3  A: So, I don't know. I mean I'm going to jail. I know this. Okay. I know it as well as you do. And you just don't want to tell me.

4  Q: You're not, you're not under arrest.

5  A: But - - -

6  Q: Right now, you're not under arrest.

7  A: So, seriously - - -

8  Q: Help us with the investigation.

9  A: As of right now, do you think I'm walking out that door and going back home tonight, though? Seriously? The truth?

10  Q: Well, I don't know what your probation officer's gonna say. That, I, want to find out who did the murder. Literally, that's my, that's my goal right here.

13  ECF No. 38-10, p. 8.

14  These exchanges tend to dispel Prentice's claim that he had already been arrested for a probation violation before questioning even began. Detective Long explicitly advised Prentice that he was not under arrest. When Prentice questioned Long about whether or not he was *going to be* arrested, Long deftly changed the subject. While Prentice made comments indicating that, in his mind, he did not think he was free to go, the test is objective, not subjective. Based on the record before this court, a reasonable innocent person in the same circumstances as Prentice would understand that he could refuse further questioning and leave. At a minimum, fairminded jurists could at least disagree on the question, which is enough to preclude habeas relief from this court. *See Dyer*, 706 F.3d at 1139 (denying habeas relief based on the conclusion that "fairminded jurist could, on this record, find that Dyer was not in custody, because many presumably fairminded jurists have indeed so found on facts similar to these"). Ground Four is denied.

**Ground Five**

In Ground Five, Prentice claims that his counsel were ineffective by "failing to object to admission of the codefendant's statements as a violation of [his] right to confrontation." ECF No. 32, p. 29. The statements were made by James Harrison and admitted through the testimony of two witnesses (Monique Cleary and Gary Hoffman) and Hoffman's transcribed interview with the police, the latter of which was introduced by defense counsel.

Here are the statements at issue as recounted in Prentice's petition:

> Gary Hoffman testified that he had a conversation with Harrison before Harrison was arrested for the murder of Miller in which Harrison explained "about doing a job on a gentleman" and that "it had something to do with stripes or a tattoo."
>
> Hoffman testified that Harrison said the reason for committing the murder was "about getting acceptance into a thing that he called a family," and that [sic] name of this family was "The National Socialist Regime."
>
> . . . [I]n Hoffman's statement to Detective Long, which was also admitted into evidence by defense counsel, he further implicated Prentice through Harrison when he stated the following:
>
> "[Harrison] was trying to earn stripes."
>
> "I think it had to do with the skinhead movement or something."
>
> "[Harrison] was trying to get accepted by these people, this guy and his girlfriend - they were supposed to pick him up when the job was done."
>
> Q: Okay, did he say what he did after the murder? You said he went out and his friends are gone, or the people that he was supposed to pick up.
>
> A: He, all he told me was that he, at first he was scared but he was happy at the same time because, you know, when, when his friends were found that, that, you know, he can either get, get out of town, you know, that he can find his friends and get his stripes…the last time I talked to him and everything, and I guess was, was the first time that I guess this other guy was brought in, okay I, I even went out there and I asked him I said, "Evil," I said, "is this the other guy that was supposed to, you know, pick you up?" And he said yes, he told me that, that his girlfriend-
>
> Q: You're talking about the one you saw on T.V. Anthony?

15

>       A:  Yeah.
>
>       Q:  And he said that was the one that was supposed to pick him up.
>
>       A:  Yeah, and the thing is as he said that, that the whole thing about it was that I guess this guy couldn't do it because he befriended the guy so he figured okay Evil, he told Evil that hey, you want to do this job, we'll give you your stripes.
>
>   Monique Cleary testified that she overheard Harrison talking to some other boys about having killed a man and "something about getting a tattoo."

ECF No. 32, p. 30-31 (citations to the record omitted).  Relying on *Bruton v. United States*, 391 U.S. 400 (1965), Prentice argues that, because he was not able to cross examine Harrison, the admission of these statements violated his rights under the Confrontation Clause of the Sixth Amendment.

The Nevada Supreme Court decided this claim in Prentice's post-conviction proceeding as follows:

>   [A]ppellant argues that his trial counsel was ineffective for failing to object to admission of the codefendant's statements as a violation of his right to confrontation as discussed in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).  Appellant cannot demonstrate prejudice because the statements of his codefendant that were admitted at trial did not facially or expressly implicate him.  *Rodriguez v. State*, 117 Nev. 800, 809, 32 P.3d 773, 779 (2001); *McRoy v. State*, 92 Nev. 758, 759, 557 P.2d 1151, 1152 (1976).  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

ECF No. 38-5, p. 6.

According to Prentice, the Nevada Supreme Court's decision is erroneous because the statements facially implicate him when placed in the context of the State's theory of the case – that being that Prentice encouraged Harrison to commit the crime in order "to earn lightning bolt tattoos." ECF No. 32, p. 32.  Prentice notes that in *Harrington v. California*, 395 U.S. 250 (1969), statements that did not specifically name the defendant, but implicated him in the crime were considered a violation of *Bruton*.  *See Harrington*, 395 U.S. at 253.

The facts in *Harrington*, however, bear little resemblance to this case.  The statements at issue in that case were made as part of the confessions of two of four co-defendants, all of whom were tried together.  *Id*. at 252; *see Bruton*, 391 U.S. at 135-36 (highlighting the potential prejudice

resulting "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial"). In addition, while the statements did not specifically name the defendant, they described his age, weight, height, and race, the last of which was particularly incriminating because the defendant was white and his three co-defendants were black. *Id.* at 253. In any case, the Court ultimately concluded that admission of the statements constituted harmless error. *Id*. at 254.

Here, Harrison was tried separately from Prentice. Cleary's testimony about what she heard Harrison say did not refer to Prentice at all, even indirectly. Hoffman's direct testimony, as elicited by the state, mentions the "National Socialist Regime," but does not refer to Prentice in particular. The references to Prentice in Hoffman's police interview link Prentice to the crime, but not in a way that was not strongly developed by other evidence presented by the State. Moreover, as respondents point out, Prentice's counsel used the transcript of the interview to effectively cross-examine Harrison. See ECF No. 45, p. 21. Thus, even if it were to look past the deference required by § 2254(d), this court must conclude that Prentice cannot satisfy either prong of the *Strickland* standard with respect to this claim. Ground Five is denied.

V.  CONCLUSION

For the reasons set forth above, Prentice's petition for habeas relief is denied.

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the

merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

Having reviewed its determinations and rulings in adjudicating Prentice's petition, the court finds that reasonable jurists could debate the court's resolution of Claim Four – i.e., whether Prentice is entitled to relief based on his claim that counsel provided ineffective assistance by not moving to suppress his statements to police pursuant to *Miranda*.  The court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Prentice's other habeas claims.

**IT IS THEREFORE ORDERED** that petitioner's amended petition for writ of habeas corpus (ECF No. 32) is DENIED.  The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is granted with respect to the following issue:

> Whether Prentice is entitled to relief based on his claim that counsel provided ineffective assistance by not moving to suppress his statements to police pursuant to *Miranda*.

The certificate is otherwise denied.

Dated:  This 9th day of September, 2014.

_____
UNITED STATES DISTRICT JUDGE